John F. Cuneo, Appellee, v. City of Chicago, Appellant.

Gen. No. 39,957.

Heard in the third division of this court for the first district at the April term, 1938. Opinion filed November 30, 1938. Rehearing denied December 16, 1938.

BARNET HODES, Corporation Counsel, for appellant; ALEXANDER J. RESA, Assistant Corporation Counsel, of counsel.

JOHN L. MCINERNEY and CAMPBELL, CLITHERO & FISCHER, both of Chicago, for appellee.

MR. PRESIDING JUSTICE HALL delivered the opinion of the court.

Defendant, the city of Chicago, appeals from a judgment for the sum of $217,345, entered against it in the superior court of Cook county on June 15, 1934, for damages alleged to have been sustained by plaintiff to his building and land located on the northeast corner of Michigan avenue and Randolph street in the city of Chicago. It is charged by plaintiff that the damages

resulted from the construction by the Illinois Central
Railroad Company of an elevated approach to a via-
duct, extending east from the east line of Michigan
avenue across the Illinois Central and Michigan Cen-
tral yards and tracks, which structure, with certain
appurtenances, is immediately south of and abutting
upon plaintiff's land. Prior to the building of the
structure, plaintiff had entered into the following con-
tract with the Illinois Central Railroad Company, on
February 10, 1931:

"In consideration of the sum of Forty-eight Hun-
dred Dollars ($4800.00) to me in hand paid by the Illi-
nois Central Railroad Company, the receipt of which
is hereby acknowledged, for myself, my heirs, exec-
utors, administrators, grantees, assignees, lessees and
tenants [I] do hereby forever release and discharge
the said Illinois Central Railroad Company of and
from any and all claims, demands and causes of action,
of whatsoever kind, nature or description, whether
past, present or future, and whether permanent, con-
tinuing or otherwise, which may arise out of damages
occasioned to the building on the premises above de-
scribed, and the effects therein, and to the occupants
of said building, by virtue of the construction of the
East Randolph Street viaduct now being carried on
adjacent to said property by said Illinois Central Rail-
road Company.

"This release is and shall be a covenant running
with the lands hereinabove described and is and shall
be binding on all future owners thereof and on all
persons who may now have or who may hereafter ac-
quire any interest therein, or to any part thereof, or
who may be in possession of or occupy the same, or
any part thereof; hereby binding not only myself, but
my heirs, executors, administrators, legal representa-
tives, grantees, assignees and lessees, the same as if
each and all of them had signed this release.

"And I do hereby agree that I will indemnify and save harmless the said Illinois Central Railroad Company of and from any claims, demands and causes of action which may be made against it by any of the tenants or occupants of said building, arising out of any damage which may be done to the said building, or the occupancy thereof, by virtue of the aforesaid work and improvements.

"It is understood that the question of providing access between that part of the station of the Illinois Central Railroad Company on Randolph Street and the building on said premises is left open for future consideration and is not affected by this release." On the trial, this document was offered in evidence by defendant and rejected by the court. The premises in question is bounded on the west by Michigan avenue, on the south by Randolph street, on the east by Beaubien court, and on the north by other land and buildings in private holdings. The lot in question has a frontage on North Michigan of 89 feet, 4⅛ inches, and an eastern frontage on Beaubien court of 89 feet, 4 inches, and a frontage on Randolph street of 69 feet, 8⅞ inches. The evidence discloses that the building on the premises is a five-story basement and brick structure of "mill construction," covering the entire lot, and that the building was erected some 60 years prior to the date of the trial. Prior to the erection of the structure in Randolph street, upon which plaintiff bases his cause of action, and long subsequent to the erection of the building described, the character of Michigan avenue had been entirely changed, the surface of this street raised to approximately the second floor of the building in question, and the street widened by practically doubling its former width. In describing the building on the premises and the condition remaining after the Michigan avenue improvement was made, a witness testified that it (the building) "is an

old warehouse with what we call a 'shirt' front put on it. They cut the old warehouse in two and put in a front on Michigan avenue and one on Randolph street and spent some little money in remodeling it. That was after the City took away the west portion of it for the Michigan avenue improvement.'' Prior to the construction of the Randolph street improvement in question, the evidence discloses that there existed immediately south of an adjoining plaintiff's land, a sidewalk 7 feet in width, running eastward and down towards Beaubien court, on about a ⅝ per cent grade, a drop of approximately 8 feet in 70 feet, the last 10 feet of which consisted of 5 steps leading to the last named street; that immediately south of and adjacent to this sidewalk was a 26-foot ramp, or roadway, extending down from the grade of Michigan avenue from the west line of the property in question to the east line of Beaubien court, and that immediately south of this ramp, which was paved with a cobble stone or granite block pavement, was a 7-foot walk, or ramp, leading to the Illinois Central station, which was just north of Randolph street and east of Beaubien court. Thereafter, this was all changed, when the structure complained of, consisting of a new sidewalk 24 feet in width, immediately south of and adjacent to the property in question, and south of this sidewalk the superstructure of the present roadway together with a cement surface 84 feet in width, were constructed. Also, adjoining the roadway on the south a 20-foot cement sidewalk was built. The total width of the new roadway and sidewalks is 128 feet. Before the structure complained of, was built, and south of the ramp described, there was a roadway leading to what the witness termed, the old Randolph street viaduct, which was built in the year 1881 by the Illinois Central and Michigan Central Railroads. One witness described this roadway as ''a poorly built road of a

temporary nature." This Randolph street viaduct, which was destroyed to make room for the new structure, to which the roadway in question led, is described in the record as a steel structure with a wooden deck and floor, and it is shown that at the time of the beginning of the erection of the present structure, the steel work and the wooden surface, or deck, of the viaduct "was in bad condition." The evidence indicates that the planking was badly worn and loose, and was only kept in repair by occasionally putting in a few new planks, and that for a number of years prior to the wrecking of this old viaduct, the speed of automobiles over it was limited to 5 miles an hour, and heavy loads were forbidden. In 1928 and 1929 notice was served on the railroads that this viaduct would have to be rebuilt.

By an ordinance of the city of Chicago, enacted in the year 1919 and amended by a further ordinance enacted in 1929, it is provided that "There shall be constructed [by the Illinois Central Railroad Company], in lieu of and as a substitute for the East Randolph Street Viaduct provided for in said ordinance [the ordinance of 1919], a new East Randolph Street Viaduct of a width of one hundred twenty-eight (128) feet instead of sixty-four (64) feet from the east curb line of North Michigan avenue to connect with Field Boulevard as extended. The north line of said viaduct shall coincide with the north line of East Randolph street extended east from North Michigan avenue." This ordinance also provided that in the construction of the new East Randolph street viaduct, extending from the east line of Michigan avenue easterly, the labor and materials for the construction of the north half thereof were to be supplied by the Illinois Central Railroad Company at its own expense, and for the south half by the south park commissioners at their own expense. The ordinance also provided that "The

Central Company [Illinois Central Railroad Company] shall assume and pay all damages to private property, if any, resulting from the changed grade of said street, occasioned by the actual construction of the inclined approach of that portion of the said new East Randolph street viaduct west of the westerly boundary line of the lands of the Michigan Central Railroad Company, provided, however, that if the north half of the new East Randolph street viaduct is constructed before the south half thereof, then all changes and alterations in the pavement, sidewalks and curbs at and near to the intersection of North Michigan avenue and East Randolph street shall be made at the time the north half of said viaduct is constructed. The expense thereof to be borne in the manner provided in this section.'' As to the expense, the same section makes provision for the division thereof between the Illinois Central Railroad Company and the South Park Commissioners.

On December 15, 1930, the City Council of the City of Chicago, recognizing the widespread unemployment in the City of Chicago, passed the following ordinance:

''Section 1. That the Illinois Central Railroad Company, its licensees, lessees or assigns, be, and they are hereby authorized and permitted to proceed, without delay, with the work of constructing the new East Randolph Street Viaduct, west of the lands of the Michigan Central Railroad Company and the suburban station facilities thereunder, in accordance with the terms and conditions of an ordinance duly passed by the City Council of the City of Chicago on October 24, 1929, entitled 'An ordinance amending Section 1701 of the Chicago Municipal Code of 1922 and amending also an ordinance entitled ''An ordinance for the establishment of Harbor District Number Three; the construction by the Illinois Central Railroad Company of a new passenger station; electrification of certain of

the lines of the Illinois Central and Michigan Central Railroad Companies within the City; and the development of the Lake Front." '

"Section 2. That the Commissioner of Public Works and the Commissioner of Buildings be, and they are hereby ordered and directed to issue any and all permits as may be necessary to do the work of constructing the viaduct and the suburban station facilities at East Randolph street, as provided for in said ordinance of October 24, 1929.

"Section 3. Nothing in this ordinance shall be construed to in any way change the covenants, agreements and obligations of the Illinois Central Railroad Company, its licensees, lessees or assigns, as provided in the ordinance duly passed by the City Council of the City of Chicago on October 24, 1929, entitled, 'An ordinance amending Section 1701 of the Chicago Municipal Code of 1922 and amending also an ordinance entitled "An ordinance for the establishment of Harbor District Number Three; the construction by the Illinois Central Railroad Company of a new passenger station; electrification of certain of the lines of the Illinois Central and Michigan Central Railroad Companies within the City; and the development of the Lake Front." '

"Section 4. That this ordinance shall be in full force and effect from and after its passage."

As stated, the structure was completed as provided in the various ordinances referred to, and plaintiff seeks to recover on the theory, as stated in his complaint, that "the said real estate and building have been greatly damaged and depreciated in their fair cash market value." The main contention of defendant is that plaintiff cannot recover because of the fact that plaintiff's release of the Illinois Central Railroad, also released the City. In reply to this contention, plaintiff contends that the release was only partial, and that it relates solely to damage to the building on the

premises as a structure and not to a diminution of the market value of the property as a whole, caused, among other things, by the interference with ingress, egress, light, air and view, resulting from the improvement as a whole.

In *Chicago & E. I. R. Co. v. Loeb,* 118 Ill. 203, an action was brought against the railroad company to recover damages sustained from the operation of defendant's railroad by throwing smoke, cinders and ashes upon plaintiff's premises. After a trial by the court without a jury, a judgment was entered for plaintiff. Plaintiff's action was brought more than 5 years after the railroad was built and in operation, plaintiff suing upon the theory that he could recover for recurrent damages. In sustaining defendant's plea, the Supreme Court said:

"We think it to be within the true intent and meaning of this provision as to damage, that there should be but one proceeding for recovery of damage, in which there should be recovery for the entire damage, past, present and future; that it should be similarly regarded, in this respect, as the provision in regard to the taking of property, where there is but one proceeding, and an assessment of compensation and damages once for all. The two provisions are coupled together, and are both in restriction of the exercise of the power of eminent domain. In respect to the awarding of compensation for the taking of private property for public use, Mills, in his work on Eminent Domain, sec. 216, says: 'The appraisement embraces all past, present and future damages which the improvement may thereafter reasonably produce.' "

Each of the witnesses for the plaintiff, in estimating the amount of the alleged damage, took into consideration the property as a whole, and did not attempt to separate any damage, alleged to have been caused to the building upon the land, from the damage to the land itself. For instance, one witness for plaintiff

testified that "in my opinion, the highest and best use of this property before the commencement of the work at Randolph Street and Michigan Avenue, was the same use. . . . In my opinion, the highest and best use since the work was completed in 1932, is the same." Another of plaintiff's witnesses testified that because of the change in the grade, effecting the first floor and the entrance to the present building, the building has been depreciated. Also, this witness testified to the effect that a piece of property like this Cuneo property, on a grade like the grade in question, practically destroys the first floor (of the building) and renders it useless for "this use as far as the first floor is concerned." All the testimony offered by plaintiff is to the same effect, and there is nothing in the record to indicate what portion, if any, of the damage awarded was to the land as land, and what portion for depreciation, if any, in the value of the building. Nowhere is it indicated that any consideration was given to the admitted fact that all damage to the building had been paid for and a release given by plaintiff in consideration for the amount paid. Should plaintiff's theory be held to be correct in that the release had to do with damage to the building only, then, in our opinion, the cause should have been submitted to the jury upon the question alone as to the damage to the land as land, without any consideration as to any alleged damage to the building now upon the land, whether physical or to its use. Any other conclusion would amount to the nullification of the release. Under these circumstances, we hold that the court was in error in refusing to admit the release in evidence, and in not confining the issue, as to damages, to the single question here suggested.

The judgment of the superior court of Cook county is reversed and the cause is remanded for a new trial.

*Reversed and remanded for a new trial.*

HEBEL and DENIS E. SULLIVAN, JJ., concur.